1 **RIEMER & BRAUNSTEIN LLP**
2 Alan L. Braunstein, Esq. (abraunstein@riemerlaw.com)
3 Three Center Plaza
4 Boston, Massachusetts 02108
5 Tel: (617) 523-9000
6        -and-
7 Steven E. Fox, Esq. (sfox@riemerlaw.com)
8 Brett J. Nizzo, Esq. (bnizzo@riemerlaw.com)
9 Times Square Tower, Suite 2506
10 Seven Times Square
11 New York, NY 10036
12 Tel: (212) 789-3100
13
14 -and-
15
16 **LAW OFFICES OF MICHAEL W. CARMEL, LTD.**
17 Michael Carmel, Esq. #007356 (michael@mcarmellaw.com)
18 80 East Columbus Avenue
19 Phoenix, Arizona 85004
20 Tel: (602) 264-4965
21
22 Co-Counsel to the Debtor
23
24                    UNITED STATES BANKRUPTCY COURT
25
26                         DISTRICT OF ARIZONA
27

| | |
|---|---|
| In re | Case No. 2:12-bk-14362 DPC |
| | Chapter 11 |
| | **DEBTOR'S EMERGENCY MOTION FOR ORDER (A) AUTHORIZING AND APPROVING DEBTOR'S ENTRY INTO A PLAN FUNDING TERM SHEET WITH BEACHSIDE CAPITAL, LLC; (B) APPROVING TERMINATION FEE AND EXCLUSIVITY PROVISIONS THEREOF; AND (C) GRANTING OTHER RELATED RELIEF** |
| SWIFT AIR, L.L.C., | |
| Debtor. | |
| | **Hearing Date: May 21, 2013 @ 9:00 a.m. (PT)** |
| | **Response Deadline: May 17, 2013 @ 4:00 p.m. (PT)** |

28

29        SWIFT AIR, L.L.C., debtor and debtor-in-possession herein (the "Debtor"), hereby files this

30 emergency motion (the "Emergency Motion") seeking entry of an order – on an emergency/expedited

31 basis, inter alia: (a) authorizing the Debtor's entry into and approving (subject to confirmation of the plan

1

of reorganization) a plan funding term sheet (the "Plan Funding Agreement"), by and among the Debtor and Beachside Capital, LLC (or a designee thereof, the "Plan Funder"), which Plan Funding Agreement takes the form attached hereto as Exhibit A; (b) approving the termination fee and exclusivity provisions provided for in the Plan Funding Agreement; and (c) granting such other relief as may be appropriate in connection herewith. In support of this Emergency Motion, the Debtor respectfully represents and sets forth as follows:

<strong><u>FACTS</u></strong>

**A.    <u>Introduction</u>**

1.      On June 27, 2012 (the "Petition Date"), the Debtor commenced this chapter 11 case by filing a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code.

2.      Pursuant to Sections 1107 and 1108 of the Bankruptcy Code, the Debtor continues to operate its business and manage its properties as a debtor-in-possession.

3.      No trustee or examiner has been appointed in this case.

4.      On July 20, 2012, the United States Trustee appointed a three-member official committee of unsecured creditors (the "Committee"). On August 7, 2012, the U.S. Trustee amended its appointment of the Committee to two members. On August 7, 2012, the U.S. Trustee amended its appointment of the Committee to two members. On October 10, 2012, the U.S. Trustee again amended its appoint of the Committee to expand its number to three members.

5.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a "core" proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for relief requested herein are Sections 105(a) and 363 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004 and 9013.

**B.    <u>Background</u>**

6.      Founded in 1997, the Debtor has evolved from a single corporate aircraft to a dynamic full-service aviation enterprise, that holds a Part 121 Operating Certificate (large aircraft) issued by the Federal Aviation Administration ("FAA"), and a Certificate of Public Convenience and Necessity

2

1     allowing domestic and international charter transportation of person, property and mail under Part 121

2     issued by the Department of Transportation ("DOT") (collectively, the "Certificates"). The Debtor

3     currently operates three (3) leased aircraft, which it uses to provide contracted air charter transportation.

4     In addition, the Debtor also manages a fourth aircraft under a management agreement entered into with an

5     unaffiliated third party.

6    **C.**     **Prior DIP Financing Approval**

7         7.      Pursuant to a motion filed August 7, 2012 ("DIP Financing Motion"), the Debtor sought

8     the entry of interim and final orders, inter alia, (i) authorizing post-petition financing to be provided by

9     Nimbos Holdings, LLC ("Nimbos" or the "DIP Lender"), (ii) granting liens and proving superpriority

10    administrative expense priority pursuant to Sections 364(c)(1), (c)(2) and (c)(3) of the Bankruptcy Code,

11    (iii) approving the DIP Loan Agreement (the "DIP Loan Agreement") with Nimbos, pursuant to which

12    the Debtor proposed to borrow up to $2.0 million on a senior secured basis.

13         8.      By Order dated August 22, 2012 (the "Interim Financing Order") [D.R. No. 154], the

14    Court, inter alia, granted interim approval of the Debtor's DIP Financing Motion.

15         9.      By Order dated September 12, 2012 (the "Final Financing Order") [D.R. No. 196], the

16    Court, inter alia, granted final approval of the Debtor's DIP Financing Motion.

17        10.     Pursuant to an emergency motion filed on February 27, 2013 (the "First DIP Amendment

18    Motion") [D.R. No. 400], the Debtor sought entry of an order authorizing and approving an amendment to

19    the DIP Loan Agreement (the "First DIP Loan Amendment").

20        11.     By Order dated March 7, 2013 (the "First DIP Amendment Order") [D.R. No. 419], the

21    Court granted the DIP Amendment Motion on the terms and conditions set forth therein.

22        12.     Pursuant to an emergency motion filed on April 18, 2013 (the "Second DIP Amendment

23    Motion") [D.R. No. 458], the Debtor sought entry of a second order authorizing and approving a second

24    amendment to the DIP Loan Agreement (the "Second DIP Loan Amendment").

1       13.     By Order dated April 23, 2013 (the "Second DIP Amendment Order" [D.R. No. 476],

2 and together with the First DIP Amendment Order the "DIP Amendment Orders"), the Court granted the

3 Second DIP Amendment Motion on the terms and conditions set forth therein

4       14.     The DIP Amendment Orders, among other things, approved the Debtor's entry into

5 amendments to the Debtor's DIP loan arrangements with Nimbos to expand the Debtor's borrowing

6 capacity in order to fund the Debtor's ongoing working capital needs, and with a view toward facilitating

7 the Debtor's efforts toward finalizing an agreement with one of the various suitors vying for the role of

8 plan funder/acquirer herein.

9 **D.**     **The Proposed Beachside Acquisition Transaction**

10       15.     After extensive negotiations, and effective as of May 9, 2013[1], the Plan Funder, the

11 Debtor, and other key creditor constituencies (including Nimbos, KMW Leasing (one of the Debtor's

12 aircraft lessors), Transjet I and Transjet II, the Debtor's other aircraft lessors), and Kevin Burdette (a co-

13 debtor with the Debtor under certain IRS obligations) ("Burdette")) executed the Plan Funding

14 Agreement. Subject to the grant of the relief sought herein, the Plan Funding Agreement provides that the

15 Debtor will promulgate and file a proposed plan of reorganization (a "Plan") and a disclosure statement

16 with respect to the Plan (a "Disclosure Statement") embodying the terms and provisions, and

17 implementing the transactions contemplated by, the Plan Funding Agreement. In that connection, the Plan

18 Funding Agreement provides for the following salient transaction components, each to be effectuated

19 under the Plan:

20            a)   Plan Funder Consideration. Subject to Bankruptcy Court confirmation of the Plan,
21                  on the "Plan Effective Date"[2], the Plan Funder will contribute three types of
22                  consideration into Reorganized Swift:
23
24                 (i)     $5.0 million cash either as equity and/or subordinated debt for working
25                       capital and/or capital expenditures;
26

---

[1]    At a hearing conducted before the Court on May 9, 2013, the parties to the Plan Funding Agreement agreed that the "Effective Date" thereunder was May 9, 2013.

[2]    Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Plan Funding Agreement, which is incorporated herein by reference.

4

(ii)     One or more contracts that, in the aggregate, are expected to provide a minimum of $21 million in supplemental post-confirmation annual operating revenue over a period approximating 24 months from the Plan Effective Date; and

(iii)    Such additional equity and/or debt funding as shall be necessary to support Reorganized Swift's business post-Plan Effective Date and to make the required Plan Payments, as determined in the discretion of the Plan Funder.

b)   Post-Confirmation Equity/Ownership. In exchange for the above-described financial contributions, the Plan shall provide that, on the Plan Effective Date, all of the existing and outstanding equity interests, including all membership interests and warrants of Debtor, shall be extinguished for no consideration or other consideration and Reorganized Swift shall issue to Beachside Capital (or its designee) membership interests in Reorganized Swift representing 100% of the issued and outstanding equity, on a fully-diluted and pledge-free basis;

c)   Post-Confirmation Assets. The Plan shall also provide that Reorganized Swift shall retain and/or succeed to the Debtor's interests in the following principal assets, among others[3]:

(i)      all of the Debtor's right, title and interest in and to all of the Debtor's operating assets;

(ii)     all of the Debtor's licenses and permits, including, without limitation, the Air Carrier Certificate issued by the Federal Aviation Administration, bearing Certificate Number 15EA344, Certificates of Public Convenience and Necessity issued by the United States Department of Transportation pursuant to 49 U.S.C. § 41101 and Canadian Foreign Air Operator Certificate issued by the Minister pursuant to Part VII of the Canadian Aviation Regulations, as well as any other licenses leased, partnered, managed or otherwise related to Debtor. All such licenses and permits must be current and allow for ongoing operations on the Plan Effective Date;

(iii)    aircraft charter agreements between the Debtor and: (a) Banner Seventeen LLC; (b) Chicago Blackhawks Hockey Team, Inc.; (c) Milwaukee Bucks, Inc.; (d) National Hockey League/Private Jet Services; (e) Boston Professional Hockey Association, Inc.; (f) the St. Louis Blues Hockey Club, L.P.; and (g) the owner or operator of the New Jersey Devils professional hockey team, and any other prospective, pending or clients in development at any stage in relation to Debtor; and

---

[3]   Notwithstanding the foregoing, the Plan Funder shall have the right (in its sole and absolute discretion) to cause any executory contract or unexpired lease to be assumed or rejected on the Plan Effective Date and, to the extent allowed by applicable law, to exclude any particular asset from the scope of the acquired assets, in which case the asset shall not be included in the assets that shall be retained by Reorganized Swift, without any change in the price or terms.

5

(iv)    all trademarks, trade names, logos, e-mail addresses, phone numbers, and other intellectual property of any nature or extent associated with the Debtor's current, planned and/or previous business or operations.

d)  <u>Plan Treatment of Claims</u>.  The terms to be memorialized in the Plan and the other definitive documents, including the treatment to be accorded existing secured, administrative, priority, and other claims under the Plan, are summarized below:

(i)    <u>Nimbos DIP Loan</u> – As of the Effective Date, the Nimbos DIP loan has an aggregate outstanding principal balance of $2.85 million.  On the Plan Effective Date or thereafter, at the request of Plan Funder, Nimbos will assign to Plan Funder (or its designee), Nimbos' rights under that certain agreement among Nimbos and Avondale Ventures, dated on or about August 15, 2012. The Nimbos DIP loan obligations shall be assumed by Reorganized Swift and modified as follows:

(a)    Payment of the additional $450,000 DIP loan shall begin thirty (30) days after the Plan Effective Date at $70,000 per month principal and interest with the balance of the DIP loan being paid in equal monthly installments of $70,000 beginning at the end of the 9th month after the Plan Effective Date (subject to the adjustments set forth below relating to Supplemental DIP Financing);

(b)    Interest will accrue at the rate of 3% per annum from the Plan Effective Date;

(c)    Any DIP financing provided by Nimbos after the Effective Date and before the entry of the Confirmation Order (hereinafter, "<u>Supplemental Financing</u>") shall be repaid upon the terms and in the manner relating to the repayment of the $450,000 DIP Loan described above, meaning and intending that the monthly payments of $70,000 shall continue to be applied to the Supplemental Financing until such time as the $450,000 DIP loan and the Supplemental Financing have been repaid in full. The monthly payments relating to the remaining DIP loan obligations shall commence after payment of the $450,000 DIP loan and the Supplemental Financing, irrespective of the nine month period described above.

(d)    To the extent that the aggregate amount of the payments required to be made by Reorganized Swift under the Plan for any and all allowed claims payable under the terms of any plan of reorganization, including the allowed claims described in subparagraphs 2(b), 2(c), 3(a), 3(b), 3(c), 4, 5, and 6 of the Plan Funding Agreement (collectively, the "<u>Plan Payments</u>") exceeds $2,250,000 (the "<u>Payment Cap</u>"), Reorganized Swift shall be entitled to offset any excess against the monthly payments on the Nimbos DIP loan obligations on a dollar-for-dollar basis as the Plan Payments are made. The term Plan Payments shall exclude only the following: (a) payments made in relation to the Nimbos

6

DIP loan; (b) payments made in relation to any secured claims of the IRS, including any amounts owed under the IRS Payment Agreement (as the same may be amended); and (c) payment of any obligations for ongoing professional fees as described in subparagraph 3(d) of the Plan Funding Agreement.

(ii) Claims of the IRS; Balkan Air Corporation

(a) Kevin Burdette (defined above as "Burdette") shall seek to reduce the obligation due the IRS and enter into an amended IRS Payment Agreement to be executed by both Burdette and Reorganized Swift. On the Plan Effective Date, Burdette and Reorganized Swift shall each be responsible for and timely pay 50% of amounts due and owing under an IRS Payment Agreement (as the same may be amended). Burdette shall execute and deliver an agreement or agreements setting forth his liability for 50% of the amounts due and owing under the IRS Payment Agreement (as the same may be modified) and memorializing his agreement to pay 50% of the amounts due and owing as they become due and owing based on the schedule in the existing IRS Payment Agreement.

(b) To the extent that the entity referred to by the parties as "Balkan Air Corporation" (or any entity associated or affiliated with Balkan Air Corporation, hereinafter "Balkan Air") is determined to hold an allowed general unsecured claim against the Debtor, such allowed claim will be included in the $360,000 payable to unsecured creditors under section 6 of the Plan Funding Agreement and, in the event the Balkan Air unsecured claim is not included in the $360,000 payable to unsecured creditors, and if the Balkan Air claim is determined to be an allowed secured claim, any and all payments relating to the allowed secured claim will apply toward the Payment Cap. In the event it is determined that Balkan Air holds an allowed secured, administrative or priority claim against the Debtor, any and all payments made by the Reorganized Swift in relation to the allowed claim will apply toward the Payment Cap.

(iii) Administrative Claims:

(a) Ordinary Trade Claims. Except as otherwise provided herein, each allowed administrative claim shall be paid the full amount thereof in cash and without interest, as soon as practicable after the later of (i) as provided in the normal course of business and in accordance with historical trade credit terms as in effect between such creditor and the Debtor, (ii) the Plan Effective Date, (iii) the date on which such administrative claim becomes an allowed administrative claim, and (iv) as such claimant, the Debtor and the Plan Funder may otherwise agree. The Debtor estimates that these claims will not exceed approximately $1,100,000 as of the Plan Effective Date.

7

(b)    <u>Rejection Damage Claims</u>.  The allowed claims for rejection of any executory contract or unexpired leases, to the extent entitled to priority under section 507(a)(2) (including as a result of section 365(g)(2)) shall be paid the full amount thereof in cash and without interest, as soon as practicable after the later of (i) the Plan Effective Date, (ii) the date on which such administrative claim becomes an allowed administrative claim, and (iii) as such claimant and the Plan Funder may otherwise agree.

(c)    <u>Professional Fees</u>.  Except as set forth in subparagraph 3(d) of the Plan Funding Agreement, the allowed claims of all estate professionals for fees and costs due and unpaid as of the Effective Date and to be incurred through the Plan Effective Date, shall be paid a total of $560,000, on a *pro rata* basis, as follows: $40,000 per month for 14 months starting on the Plan Effective Date. The remaining balance of any allowed professional fee claims shall be waived (except that all professionals may retain payments made to them prior to the Plan Effective Date).

(iv)    <u>Priority Claims</u>.  Each allowed priority claim shall be paid the full amount thereof in cash and without interest, as soon as practicable after the later of (i) as provided in the normal course of business and in accordance with historical credit terms as in effect between such creditor and the Debtor, (ii) the Plan Effective Date, (iii) the date on which such priority claim becomes an allowed administrative claim, and (iv) as such claimant, the Debtor and the Plan Funder may otherwise agree.

(v)    <u>General Unsecured Claims</u>. Each holder of a general unsecured claim shall receive, in full settlement and satisfaction of its allowed claim, its *pro rata* share of $360,000 to be paid over a 24 month period following the Plan Effective Date.  In addition, on the Plan Effective Date, Reorganized Swift shall transfer all of its claims and causes of action arising under chapter 5 of the Bankruptcy Code to a liquidating trust for the exclusive benefit of the holders of allowed unsecured claims. The Plan shall provide for the establishment of a liquidating trust and the appointment of a liquidating trustee.

(vi)    <u>Critical Vendors</u>.  Each claim of a critical vendor (as shall be identified by the Debtor and the Plan Funder in the Plan) shall receive in full settlement and satisfaction of its allowed claim its *pro rata* share of the sum of $60,000 to be paid over a 24 month period following the Plan Effective Date.

(vii)    <u>Equity Interests</u>.  All existing equity interests and warrants and other indicia of ownership of Debtor shall be extinguished on the Plan Effective Date with the holders thereof not receiving any consideration under the Plan.

8

e) Additional Material Plan/Transaction Terms:

    (i)    <u>KMW Leasing Administrative Claims</u> – Upon the occurrence of the Plan Effective Date, KMW Leasing will waive and release the Debtor's estate and Reorganized Swift from any and all claims arising under or related to its lease with the Debtor with regard to the Debtor's use of the aircraft identified as N250MY.

    (ii)    <u>Transjet I, LLC and Transjet II, LLC</u>. Upon the occurrence of the Plan Effective Date, Burdette, Transjet I, and Transjet II shall:

        (a)    Acknowledge and agree that amounts owed under the lease for the B737 aircraft identified as N801TJ shall be offset against damages incurred by Swift as a result of Transjet I's and Transjet II's failure to make certain agreed upon payments to Stambaugh Aviation. To the extent that additional amounts are due under the lease for N80ITJ, Transjet I will waive such additional amounts, and shall release the Debtor's bankruptcy estate and Reorganized Swift from all liability for such amounts;

        (b)    Transjet I and the Plan Funder shall agree upon the terms of a new lease for the aircraft identified as N801TJ, including the following principle terms:

            i.    Term – 12 months (starting from the Plan Effective Date);

            ii.    Rent – $40,000 per month;

            iii.    Expenses – Reorganized Swift shall be responsible for all ordinary and anticipated expenses of operation, with Transjet I being responsible for major engine repairs;

        (c)    Unless earlier terminated by its terms or otherwise rejected in accordance with applicable provisions of the Bankruptcy Code, the lease for the B737 aircraft identified as N802TJ shall rejected on the Plan Effective Date, with all claims arising out of or related to the Debtor's use or possession of that aircraft being waived (unless, prior to the Plan Effective Date, Reorganized Swift and Transjet II reach agreement on the terms of a new lease for N802TJ); and

        (d)    Swift Aviation will waive any and all claims in respect of past due rents and other obligations arising as a result of the Debtor's occupancy of its existing business premises through the Plan Effective Date. Effective as of the Plan Effective Date, Swift Aviation shall enter into a new lease for Reorganized Swift's occupancy of its existing business premises at the fixed rate of $9,000 per month for a term of 6 months.

9

f) <u>Regulatory Approvals</u>. Consummation of the transactions set forth in the Plan Funding Agreement and the Plan shall be subject to the receipt of all necessary regulatory approvals or consents from governmental units with jurisdiction over the Debtor or the operation of its current business. This applies, without limitation, to the approval of the DOT and the FAA.

16. In light of the fact that (i) the Debtor has been searching for a suitor/plan funder for many months, (ii) the extensive regulatory approval process that must be undertaken, and (iii) the severity and immediacy of the Debtor's funding requirements, among other reasons, the Debtor and the other parties to the Plan Funding Agreement have also determined that it is appropriate to include certain exclusivity provisions in the Plan Funding Agreement, which provisions, if approved, will serve to restrict the Debtor's and Nimbos' ability to solicit alternative acquisition proposals and transactions. In this regard, the Plan Funding Agreement provides, in relevant part, as follows (collectively, the "<u>Exclusivity Provisions</u>"):

<u>Exclusivity</u>. In consideration of the Plan Funder's agreement to consummate the transactions contemplated by the Plan Funding Agreement, neither the Debtor nor the DIP Lender will, with respect to the Debtor's business or assets or the membership interests in the Debtor, do any of the following:

    i. enter into any agreement or other commitment for the sale or other disposal to any person other than Plan Funder or its affiliates;

    ii. solicit, initiate, or encourage any inquiries or proposals to acquire the Debtor from any person other than Plan Funder or its affiliates;

    iii. initiate or engage in negotiations with any person other than Plan Funder or its affiliates concerning any proposal to acquire the Debtor; or

    iv. discuss, negotiate, or propose any chapter 11 plan for the Debtor (except the one described herein), or the sale of all or substantially all of the Debtor's assets under the applicable sections of the Bankruptcy Code.

17. The Exclusivity provisions set forth above are intended to be binding on and enforceable against the DIP Lender on the Effective Date, and binding on the Debtor only upon entry of an order of the Court specifically approving such provisions (*i.e.*, upon entry of the Exclusivity Order (defined below)). If the Court has not entered an order approving the Plan Funder Protections (defined below) on

1    or before the timeframes provided for in the Plan Funding Agreement[4], then the Plan Funder shall be

2    entitled to terminate the Plan Funding Agreement without any liability to any person or entity on such

3    date if, as of such date. The Debtor (and Nimbos) believes that this restriction, while extreme in certain

4    circumstances, is appropriate in the context of this chapter 11 case.

5         18.    The Plan Funding Agreement additionally requires, as a condition precedent, that the

6    Debtor obtain, by no later than the Exclusivity Order Deadline, an order of the Court which grants

7    approval to the Debtor for payment of a "termination fee" to the Plan Funder in certain limited

8    circumstances. In this regard, the Plan Funding Agreement provides, in relevant part, as follows:

9              Termination Fee. In consideration of [the Plan Funder's] agreement to
10             proceed with the transaction contemplated by the Plan Funding
11             Agreement, and as a material inducement for, and condition of, [the Plan
12             Funder's] entry into any related definitive documents, the Plan Funding
13             Agreement requires that the Debtor shall obtain an order of the Court
14             providing that if (a) any competing plan is confirmed or (b) all or
15             substantially all of the Debtor's assets are sold to a purchaser other than
16             [the Plan Funder] (by the Debtor or any trustee appointed in a chapter 11
17             or chapter 7 case), then the Debtor shall pay to the Plan Funder a
18             termination fee ("Termination Fee") in the aggregate amount of
19             $250,000, which amount shall be paid by the Debtor in immediately
20             available funds on the effective date of the competing plan or the closing
21             of the sale, as applicable.
22
23        19.    In the event that such order is not obtained by the Exclusivity Order Deadline, the Plan

24   Funder may likewise terminate the Plan Funding Agreement. Here too, the Debtor (and Nimbos) believes

25   that this commitment, while extreme in certain circumstances, is appropriate in the context of this chapter

26   11 case.

27        20.    Separately, the Plan Funding Agreement contains other deadlines as conditions

28   precedent, including dates by which the Plan and Disclosure Statement must be filed and thereafter

29   approved, the Plan confirmed and the "Plan Effective Date" (*i.e.,* closing) completed, as follows:

---

[4]    The Plan Funding Agreement provides that no later than May 13, 2013, the Debtor shall file a motion with the
Court seeking approval of the Exclusivity Provisions (defined below), which order must be entered no later
than ten (10) calendar days after the Effective Date (i.e., May 19, 2013). At the May 9th hearing, the Plan
Funder agreed to extend that deadline to accommodate a hearing on this Emergency Motion on May 21, 2013
at 9:00 a.m. (PT) (the "Exclusivity Order Deadline").

Case 2:12-bk-14362-DPC    Doc 485    Filed 05/13/13    Entered 05/13/13 13:41:17    Desc
Main Document      Page 11 of 35

a)     <u>Plan/Disclosure Statement</u>. Within 10 calendar days after the Effective Date, the Debtor is required to file with the Court the Plan and Disclosure Statement in form and content consistent with Plan Funding Agreement and acceptable as to form to the Debtor, the Plan Funder and the DIP Lender;

b)     <u>Plan Funder Protections Motion</u>. As noted above, no later than May 13, 2013, the Debtor is required to file with the Court a motion seeking approval of the Plan Funder Protections (defined below), with any such order to be entered no later than May 21, 2013 (*see* Note 3 above); and

c)     <u>Plan Confirmation</u>. Within sixty (60) days after the Effective Date the Court shall have entered an order confirming the Plan (the "<u>Confirmation Order</u>") in form and content acceptable to the Debtor, the Plan Funder and Nimbos.

## RELIEF REQUESTED

21.     So that the transactions contemplated by the Plan Funding Agreement can proceed in an orderly and timely manner, the Debtor hereby seeks entry of an order, <u>inter alia</u>: (a) authorizing the Debtor's entering into and approving (subject to confirmation of the Plan) the Plan Funding Agreement with the Plan Funder; (b) approving the Exclusivity Provisions set forth in the Plan Funding Agreement, (c) approving the Termination Fee (and together with the Exclusivity Provisions the "<u>Plan Funder Protections</u>"); and (d) granting such other relief as requested herein.

## BASIS FOR RELIEF REQUESTED

**A.     Approval Of The Beachside Plan Funding Agreement
Is In The Best Interests Of The Debtor And Its Estate**

22.     The Debtor, Nimbos, KMW Leasing, Transjet I and Transjet II, Burdette, and the Plan Funder have entered into the Plan Funding Agreement, a copy of which is attached hereto as <u>Exhibit A</u>, the significant terms and provisions of which are described in paragraphs 15-20 above.

23.     The Court may approve the Plan Funding Agreement and authorize the Debtor to enter into the Plan Funding Agreement under section 363 of the Bankruptcy Code. Section 363 requires court approval for the use, sale or lease of a debtor's assets outside the ordinary course of business and, in pertinent part, provides:

> (b)(1)    The trustee, after notice and a hearing, may use, sell, or lease other than in the ordinary course of business, property of the estate. . .

1      (m) The reversal or modification on appeal of an authorization
2      under subsection (b) or (c) of this section of a sale or lease of property
3      does not affect the validity of a sale or lease under such authorization to
4      an entity that purchased or leased such property in good faith, whether
5      or not such entity knew of the pendency of the appeal, unless such
6      authorization and such sale or lease were stayed pending appeal.
7
8    11 U.S.C. § 363(b), (m).

9  24. The Debtor is <u>not</u> requesting the Court's approval of the transactions contemplated by the

10    Plan Funding Agreement at this time. The Debtor instead intends to obtain such approval as part of the

11    Plan, subject only to confirmation thereof. However, and as is required by the Plan Funding Agreement,

12    by this Emergency Motion the Debtor requests the limited authority to enter into the Plan Funding

13    Agreement (even though it will not be binding, other than for the Plan Funder Protections) and, in

14    connection therewith, for approval of the Plan Funder Protections.

15  25. Courts have authorized debtors to enter into transactions similar to the transaction

16    contemplated by the Plan Funding Agreement in the context of pre-plan sales transactions if the

17    transactions represent the exercise of the reasonable business judgment of the debtor. *Walter v. Sunwest*

18    *Bank (In re Walter)*, 83 B.R. 14, 19 (9th Cir. BAP 1988) (*quoting Institutional Creditors of Continental*

19    *Airlines, Inc. (In re Continental Airlines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986); *Licensing By Paolo,*

20    *Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997); *In re Martin*, 91 F.3d 389, 396 (3d Cir.

21    1996); *Stephens Indus. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063,

22    1070 (2d Cir. 1983); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re*

23    *Thomas McKinnon Securities, Inc.*, 120 B.R. 301 (Bankr. S.D.N.Y. 1990); *In re Coastal Indus., Inc.*, 63

24    B.R. 361, 367 (Bankr. N.D. Ohio 1986).

25  26. The authority to sell assets conferred upon a debtor by section 363(b) "include[s] a sale

26    of substantially all the assets of an estate." *Otto Preminger Films, Ltd. v. Qintex Entm't, Inc. (In re Qintex*

27    *Entm't, Inc.)*, 950 F.2d 1492, 1495 (9th Cir. 1991). The Debtors believe that the same standard should

28    apply here. *Cf. In re Fruit of the Loom, Inc.*, 274 B.R. 631 (D.Del. 2002) (approving termination fee in

1  context of proposed sale contingent upon confirmation of chapter 11 plan of reorganization incorporating

2  sale agreement).

3      27.    Courts typically consider the following four factors in determining whether a proposed

4  sale satisfies this standard:

        a)    whether a sound business justification exists for the sale;

        b)    whether adequate and reasonable notice of the sale was given to interested parties;

        c)    whether the sale will produce a fair and reasonable price for the property; and

        d)    whether the parties have acted in good faith.

15  *See, e.g., In re Work Recovery*, 202 B.R. 301, 303-04 (Bankr. D. Ariz. 1996); and *In re Wilde Horse*

16  *Enterprises, Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991); *In re Weatherly Frozen Food Group, Inc.*,

17  149 B.R. 480, 483 (Bankr. N.D. Ohio 1992); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D.

18  Del. 1991).

19      28.    As the Court has witnessed firsthand, since late January 2013 the Debtor and the DIP

20  Lender have directed and focused their energies toward attracting a new equity sponsor or capital source

21  in order to achieve a successful reorganization here. As a result of these efforts, the Debtor has engaged in

22  detailed negotiations and due diligence activities with multiple potential suitors. Following numerous

23  starts and stalls[5], the Debtor has succeeded in finalizing the Plan Funding Agreement with the Plan

24  Funder, which agreement sets forth the definitive terms under which Beachside Capital (or a designee), as

25  "Plan Funder", will promulgate with the Debtor and fund a plan of reorganization for the Debtor.

26  Importantly, the Plan Funding Agreement has been negotiated at arm's length and in good faith, and in

27  consultation with Nimbos, KMW Leasing, Transjet I and II, and Burdette, and bears their respective

28  endorsement. Additionally, more recently the Committee has been (a) in regular contact with the Debtor's

29  representatives on a real-time basis as plan-related matters have been developing, and (b) in direct contact

---

[5]    Among other such starts and stops, the Court will recall the Debtor's failed effort to advance a transaction with an affiliate of LVAir, LLC -- Global Phoenix LLC, a Nevada limited liability company. Global later failed to get past the first deliverable under its proposed plan funding term sheet.

1 with the Plan Funder. The Debtor is cautiously optimistic that the Committee's endorsement of the

2 transactions memorialized in the Plan Funding Agreement will be forthcoming.

3       29.     As part of the transactions contemplated under the Plan Funding Agreement and the Plan,

4 and among other significant benefits presented by the Plan Funding Agreement, the Plan Funder has

5 committed to infuse substantial capital to support go-forward (*i.e.*, post-confirmation) operations. The

6 Plan Funder has also committed to source additional new lines of business for the Debtor that will provide

7 the needed revenue enhancements long-sought by the Debtor. Last, the Plan Funder has committed to

8 provide the funds necessary to fund meaningful plan recoveries for <u>all</u> of the Debtor's creditors, in

9 consideration of which contributions the Plan Funder will acquire post-confirmation control of the

10 Debtor.

11       30.     The Debtor and its key business partners and creditor constituents – by their express

12 endorsement of the Plan Funding Agreement – firmly believe that effectuation of the transactions

13 contemplated by the Plan Funding Agreement will (a) secure the Debtor's long term prospects, (b)

14 provide the financial stability necessary to assure the Debtor's business partners, including, without

15 limitation, the sports franchises it services, that it will be able to provide the contracted for service into the

16 future, and (c) provide the means and funding by which the Debtor will be able to make meaningful

17 distributions under a Plan to claimants at all levels of its capital structure. In the absence of this Court's

18 grant of the relief requested herein, the Debtor's ability to continue as a going concern may be

19 jeopardized.

20 **B.**     <u>**The Plan Funder Protection Provisions**</u>

21       31.     As noted above, the Plan Funding Agreement contains a requirement that the Debtor

22 obtain this Court's approval of certain Plan Funder Protections, namely the Termination Fee and

23 Exclusivity Provisions, as a condition precedent to the Plan Funder's obligation to proceed with the

24 transactions contemplated by the Plan Funding Agreement. In this connection, and as described in

25 paragraph 18 above, the Debtor has agreed to pay to the Plan Funder a Termination Fee of $250,000 upon

26 the occurrence of certain limited events, which payment is intended as a measure of compensating the

15

1   Plan Funder for the reasonable fees and expenses incurred in connection with the diligence, negotiation,

2   documentation, and pursuit of the transactions contemplated by the Plan Funding Agreement.

3       32.     As also noted above, the Plan Funding Agreement contains a requirement that the Debtor

4   obtain this Court's approval of certain Exclusivity Provisions as a condition precedent to the Plan

5   Funder's obligation to proceed with the transactions contemplated by the Plan Funding Agreement. In this

6   regard, the Exclusivity Provisions, if approved, would operate to restrict the Debtor's and Nimbos' ability

7   to solicit alternative acquisition proposals and transactions. However, in light of the fact that (i) the

8   Debtor has been searching for a suitable plan funder for many months, (ii) the extensive regulatory

9   approval process that must be undertaken on a parallel track, and the time and expense associated

10  therewith, and (iii) the severity and immediacy of the Debtor's funding requirements, among other

11  reasons, the Debtor and the other parties to the Plan Funding Agreement have determined that it is

12  appropriate to include the Exclusivity Provisions in the Plan Funding Agreement.

13      33.     In the Debtor's best business judgment, the provisions of the Plan Funding Agreement

14  concerning the Plan Funder Protections provide the Plan Funder with reasonable protection and

15  compensation in consideration for agreeing to enter into the Plan Funding Agreement, notwithstanding

16  the uncertainties presented by the plan confirmation process. As reasonable and necessary inducements to

17  the Plan Funder to proceed with the plan confirmation process, the Debtor requests that the Court

18  promptly approve the Plan Funder Protections.

19      34.     Break-up and other termination fees are a normal, and in some cases necessary,

20  component of sales outside the ordinary course of business under section 363 of the Bankruptcy Code.

21  *See, e.g., In re Integrated Resources, Inc.*, 147 B.R. 650, 660 (S.D.N.Y. 1992) (noting that break-up fees

22  may be legitimately necessary to convince a single "white knight" to enter the bidding by providing some

23  form of compensation for the risk it is undertaking); *In re Financial News Network, Inc.*, 126 B.R. 152

24  (S.D.N.Y. 1991), *appeal dismissed,* 931 F.2d 217 (2d Cir. 1991); *In re Crowthers McCall Pattern, Inc.*,

1    114 B.R. 877, 879 (Bankr. S.D.N.Y. 1990) (break-up fees in merger agreement approved); *In re 995 Fifth*

2    *Ave. Assoc., L.P.*, 96 B.R. 24, 28-9 (Bankr. S.D.N.Y. 1989).[6]

3        35.    Decisions in this District have held that the appropriate test/standard to be applied in

4    evaluating the propriety of a proposed break-up or termination fee is whether approval is in the "best

5    interest of the estate". *See In re America West Airlines, Inc.*, 166 B.R. 908, 912 (Bankr. D.AZ 1994). In

6    considering whether to approve a break-up fee, still other courts consider, generally, the following three

7    factors: (i) the relationship between the initial bidder and the seller; (ii) whether the fee is designed to

8    encourage bidding; and (iii) the size of the fee in relation to the purchase price. *See In re Integrated*

9    *Resources*, 147 B.R. at 657-63.

10        36.    Given the accelerated nature of the sale and plan confirmation process contemplated by

11    the Plan Funding Agreement, the Plan Funder has expended substantial resources in negotiating the Plan

12    Funding Agreement and performing due diligence, and will expend substantial additional time and

13    resources in finalizing an acceptable form of Plan and related Disclosure Statement and traveling down

14    the regulatory gauntlet described to the Court on numerous prior occasions. Approval of the Termination

15    Fee in connection with the sale of significant assets in a situation such as the Debtor faces here is an

16    established practice that will facilitate the Debtor's efforts to assure expeditious progress toward

17    confirmation of a plan and a sale to a committed acquirer at a price and on such other material terms that

18    the Debtor and other key estate constituents believe are fair.

19        37.    Here, the proposed Termination Fee – which constitutes a fair and reasonable percentage

20    of the proposed transaction value and which is reasonably related to the risk, effort, and expenses of the

21    Plan Funder – is generally permissible, is in the best interests of the Debtor's estate as a whole, and

---

[6]    The Termination Fee and the Expense Reimbursement provisions meet the standard established by the Court of Appeals for the Third Circuit in *Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999), and should be approved. The Termination Fee is the product of good faith, arm's-length negotiations among the Debtor, the estate's other key constituencies, and the Plan Funder. Each amount is fair and reasonable in light of the efforts of the Plan Funder in committing to and signing the Plan Funding Agreement, which, if approved, will enable unsecured creditors to receive a meaningful cash dividend and the prospect of additional distributions based on any proceeds obtained pursuant to certain possible litigation. In addition, the Plan Funder has incurred and will continue to incur time and expense costs in connection with entering into the Plan Funding Agreement, including its due diligence and the negotiation of definitive transaction documents, including the Plan, with the Debtor.

1    therefore should be approved in the specific context of the Debtor's chapter 11 case. *See, e.g., In re*

2    *Crown Corp., 679 F.2d 774 (9th Cir. 1982)* ($2.2 million purchase, a $110,000 break-up fee (4.9%) was

3    approved); *In re 995 Fifth Ave. Assoc.*, 96 B.R. at 28. *Accord In re Integrated Resources, Inc.*, 147 B.R. at

4    662 (break-up fee reasonable percentage of proposed purchase price and in accord with industry

5    averages); *In re Twenver, Inc.*, 149 B.R. at 956-57 (proposed break-up fee not approved because it

6    exceeded 10% of proposed purchase price and was determined to hamper bidding).

7          38.    By all recognized measures, the Termination Fee – in the amount proposed – is entirely

8    reasonable and customary in this type of transaction. *See, e.g., In re KB Toys, Inc.*, Case No. 04-10120

9    (JBR) (Bankr. D. Del. Apr. 8, 2004) ($200,000 break-up fee and $450,000 expense reimbursement

10    allowance in asset sale of approximately $8 million); *In re Z13 Co., Inc.*, Case No. 03-13672 (JBR)

11    (Bankr. D. Del. Dec. 16, 2003) ($200,000 break-up fee in asset sale of approximately $6,250,000); *In re*

12    *Polaroid Corp.*, Case No. 01-10864 (NW) (Bankr. D. Del. Nov. 19, 2001) ($1,300,000 break-up fee in

13    asset sale of $32,000,000); *In re Medlab, Inc.*, Case No. 97-1893 (PJW) (Bankr. D. Del. Apr. 28, 1998)

14    ($250,000 break-up fee in connection with $8,000,000 sale transaction). Other than the Termination Fee,

15    the Plan Funder will not receive any compensation or reimbursement in connection with the negotiation,

16    due diligence, documentation and Court approval related to the Plan Funding Agreement and the

17    transactions contemplated thereby.

18          39.    The Debtor also believes that the Exclusivity Provisions are reasonable for this type of

19    transaction. It is important to note that the Exclusivity Provisions are limited both in scope and in the time

20    that they are effective. First, the Exclusivity Provisions will only have been applicable from the time the

21    Debtor signed the Plan Funding Agreement through the date that the Court entertains confirmation of the

22    Plan. In the event the Plan is not confirmed, or the parties otherwise terminate the Plan Funding

23    Agreement, the Debtor will be free to solicit alternative transactions. The Exclusivity Provisions thus

24    protect the Plan Funder, in a reasonable manner, from the harm that will follow if the Debtor and/or

25    Nimbos solicit competing bids until such time as the parties have a reasonable time, and in an orderly

26    environment, to achieve confirmation of the Plan. At the same time, nothing in the Plan Funding

1  Agreement operates to restrict any other interested party with the requisite standing – including for these

2  purposes the Committee – from seeking alternative transactions involving the Debtor and/or its assets and

3  operations, or to file one or more competing plans of reorganization. In this regard, the limited nature and

4  scope of the Exclusivity Protections are thus in the best interests of the estate as a whole, and the approval

5  of same will present no harm to the estate or its creditors.

6      40.     The Plan Funder Protections are a material inducement for, and a condition of the Plan

7  Funder's willingness to enter into the Plan Funding Agreement. The Plan Funder was, and remains,

8  unwilling to enter into the transaction at hand and serve as plan sponsor with the Debtor unless it is

9  assured these protections will be in place. In this connection, the Plan Funding Agreement expressly

10  provides that the Plan Funder may terminate the Plan Funding Agreement if the Plan Funder Protections

11  are not approved by the Court. In light of the particular circumstances of this chapter 11 case, the Plan

12  Funder's position in this regard is reasonable given the time and expense that will be incurred in seeking

13  confirmation of the Plan, and pursuing the required regulatory approvals on a parallel track to maximize

14  the prospects that the Debtor may be able to successfully emerge from chapter 11 at the earliest possible

15  date.

16                                          **CONCLUSION**

17      41.     As noted above, the Debtor requests that the Court entertain the request for approval to

18  enter into the Plan Funding Agreement, and approval of the Plan Funder Protections contained therein, on

19  an emergency and expedited basis.

20      42.     As also noted above, shortly after the filing of this Emergency Motion the Debtor intends

21  to file the Plan and Disclosure Statement, all with a view toward emerging from chapter 11 before

22  commencement of the 2013-14 NBA and NHL seasons as a means of giving these key business partners

23  comfort as to the Debtor's stability and long-term prospects. Any delay in the process that would cause

24  confirmation to spill over into the Debtor's lucrative sports travel season could adversely affect the

25  Debtor's reorganization prospects. The Debtor therefore requests that this Court establish **9:00 a.m. (PT)**

26  **on May 21, 2013**, as the date and time for a hearing before this Court to consider the relief sought herein.

1      43.     In light of the large number of creditors in this case, and the limited nature of the relief

2  being sought hereunder, the Debtor seek to limit the number of parties to be served with notice of this

3  Emergency Motion and the hearing thereon. In this regard, the Debtor proposes to send notice of this

4  Emergency Motion to the following parties: (i) the U.S. Trustee, (ii) counsel to the DIP Lender, (iii)

5  counsel to the Committee, (iv) the other parties signatory to the Plan Funding Agreement, including the

6  Plan Funder and its counsel, and (v) any party requesting notice of all pleadings pursuant to Bankruptcy

7  Rule 2002. In light of the nature of the relief requested, the Debtor submits that no other or further notice

8  is required.[7]

9      44.     As set forth herein, approval of the use of the Plan Funding Agreement, and approval of

10  the Plan Funder Protections are integral to the Debtor's ability to emerge from chapter 11. In addition, the

11  Debtor has demonstrated sufficient cause to limit notice to the notice parties identified above. The Plan

12  Funder Protections are material inducements for, and a condition of, the Plan Funder's entering into the

13  Plan Funding Agreement, and will provide the Debtor with a meaningful post-petition benefit. These

14  provisions are also the result of arm's-length negotiations and are in amounts or on such terms as other

15  courts have found to be reasonable and should therefore be approved.

16      45.     Finally, to implement the foregoing successfully, and given the funding exigencies here,

17  the Debtor also requests that any applicable stay (including, without limitation, under Bankruptcy Rule

18  6004(h)) should be waived and should not apply to a grant of the relief requested herein.

19      46.     No prior motion for the relief requested herein has been made to this or any other court.

---

[7]   Courts have held that the notice of a proposed sale of all of the assets of the estate should "(a) place all parties on notice that the Debtor is liquidating his business; (b) disclose accurately the full terms of the sale; (c) explain the effect of the sale as terminating the debtor's ability to continue in business; and (d) explain why the proposed price is reasonable and why the sale is in the best interest of the estate." *Delaware & Hudson Ry.*, 124 B.R. at 180; *accord In re Naron & Wagner, Chartered*, 88 B.R. 85, 88 (Bankr. D. Md. 1988). *See also, Folger Adam Security Inc. v. DeMatteis/MacGregor*, 209 F.3d 252, 265 (3d Cir. 2000) (stating that notice is sufficient if it includes "the time and place of any public sale, the terms and conditions of any private sale, states the time for filing objections and, if real estate is being sold, provides a general description of the property"); *In re WBQ Partnership*, 189 B.R. 97, 103 (Bankr. E.D. Va. 1995) ("notice is sufficient if it includes the terms and conditions of the sale, if it states the time for filing objections, and if the estate is selling real estate, it generally describes the property') (*quoting In re Karpe*, 84 B.R. 926, 929 (Bankr. M.D. Pa. 1988)).

1    WHEREFORE the Debtor respectfully requests entry of an Order granting the relief requested

2    herein and such other and further relief as the Court may deem just and appropriate.

3    Dated: May 13, 2013

4                                          Respectfully submitted,

6                                          SWIFT AIR, L.L.C.

8                                          By its counsel,

10                                         RIEMER & BRAUNSTEIN LLP
11                                         Alan L. Braunstein
12                                         Three Center Plaza
13                                         Boston, Massachusetts  02108
14                                         Tel: (617) 523-9000
15                                         abraunstein@riemerlaw.com
16                                              -and-
17                                         Steven E. Fox, Esq.
18                                         Brett J. Nizzo, Esq.
19                                         Times Square Tower, Suite 2506
20                                         Seven Times Square
21                                         New York, NY 10036
22                                         Tel: (212) 789-3100
23                                         sfox@riemerlaw.com
24                                         bnizzo@riemerlaw.com

26                                              -and-

28                                         LAW OFFICES OF MICHAEL W.
29                                         CARMEL, LTD

31                                         /s/ Michael Carmel
32                                         Michael Carmel, Esq. #007356
33                                         80 East Columbus Avenue
34                                         Phoenix, Arizona 85004
35                                         Tel: (602) 264-4965
36                                         michael@mcarmellaw.com

41    1559629.1

21

## EXHIBIT A

## TO

## DEBTOR'S EMERGENCY MOTION FOR ORDER (A) AUTHORIZING AND APPROVING DEBTOR'S ENTRY INTO A PLAN FUNDING TERM SHEET WITH BEACHSIDE CAPITAL, LLC; (B) APPROVING TERMINATION FEE AND EXCLUSIVITY PROVISIONS THEREOF; AND (C) GRANTING OTHER RELATED RELIEF

**TERM SHEET**

**BEACHSIDE CAPITAL LLC**

-and-

**SWIFT AIR, LLC, NIMBOS HOLDINGS, LLC, KMW LEASING, LLC, TRANSJET I, LLC, TRANSJET II, LLC, KEVIN BURDETTE, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF SWIFT AIR, LLC**

This Term Sheet (the "Term Sheet") summarizes the principal terms of a potential acquisition (the "Transaction") of the equity interests of Swift Air, LLC (the "Debtor" or "Swift Air") by Beachside Capital LLC, a limited liability company, or its designee ("Beachside"). Swift Air is a currently a debtor in possession in a chapter 11 bankruptcy case (the "Case"), which case is pending in the United States Bankruptcy Court for the District of Arizona (the "Bankruptcy Court"), Case No. 12-14362.

As used herein, the term "Effective Date" means the date on which all parties to this Term Sheet have executed this Term Sheet and the term "Plan Effective Date" means the date on which all conditions to the effectiveness of the Plan (as defined below) have been satisfied.

Timeline:

(a) No later than 12:00 P.M. Arizona time on May 10, 2013, Beachside shall have deposited the sum of $2.0 million into an escrow account under the exclusive control of Beachside and shall have provided written evidence of such deposit to Debtor and Nimbos. Such sum shall remain in escrow until the earlier of (x) the Plan Effective Date and (y) an Event of Termination. If the Plan Effective Date occurs before an Event of Termination occurs, then the escrow shall be released to the Reorganized Swift on the Plan Effective Date and shall be counted as a credit against the cash to be contributed by Beachside under the confirmed plan. If an Event of Termination occurs prior to the Plan Effective Date, then, immediately upon the occurrence of an Event of Termination, the funds shall be released to Beachside, without offset, reduction, or deduction of any nature or extent. An "Event of Termination" shall mean (a) August 31, 2013 if the Plan Effective Date has not occurred by then; (b) the first date on which any of the conditions set forth in this Term Sheet have not been satisfied in a timely manner; and (c) the date of the entry of an order converting Swift Air's case to a case under chapter 7 of the United States Bankruptcy Code, or dismissing Swift Air's chapter 11 case.

(b) Within ten (10) calendar days after the Effective Date, Debtor shall file with the Bankruptcy Court a disclosure statement and plan of reorganization the ("Plan") in form and content consistent with this Term Sheet and acceptable to Debtor, Beachside and Nimbos Holdings, LLC ("Nimbos") acceptable to each in their sole discretion.

(c) As described below, all estate professionals shall agree, in writing, within five (5) calendar days after the Effective Date to the proposal for payment of all administrative expense claims of such professionals, whether presently allowed or paid.

(d) No later than May 13, 2013, the Debtor shall file a motion with the Bankruptcy Court to approve of terms of the Exclusivity provision set forth below, the order for which shall be entered no later than ten (10) calendar days

1

after the Effective Date.

(e) Within sixty (60) days after the Effective Date the Bankruptcy Court shall have entered an order confirming the Plan (the "Confirmation Order") in form and content acceptable to Debtor, Beachside and Nimbos each in their sole discretion.

Consideration:  Subject to Bankruptcy Court confirmation of a plan of reorganization for the Debtor that memorializes the terms set forth herein and in the Definitive Documents (defined below), on the Plan Effective Date, Beachside will contribute three types of consideration into Swift:

(a) $5.0 million cash either as equity and/or subordinated debt for working capital and/or capital expenditures;

(b) One or more contracts that, in the aggregate, are expected to provide a minimum of $21.0 million in supplemental post-confirmation annual operating revenue over a period approximating 24 months from the Plan Effective Date; and

(c) Such additional equity and/or debt funding as shall be necessary to support the Reorganized Debtor's business post-Plan Effective Date, as determined in the discretion of the Beachside.

In exchange for these contributions, the Plan shall provide that, on the Plan Effective Date, all of the existing and outstanding equity interests, including all membership interests and warrants of Debtor, shall be extinguished for no consideration or other consideration and Reorganized Swift shall issue to Beachside (or its designee) membership interests in Reorganized Swift representing one hundred percent (100%) of the issued and outstanding equity, on a fully-diluted and pledge-free basis.

The Plan shall also provide that Reorganized Swift shall retain and/or succeed to the Debtor's interests in the following principal assets, among others:

a) all of the Debtor's right, title and interest in and to all of the Debtor's operating assets;

b) all of the Debtor's licenses and permits, including, without limitation, the Air Carrier Certificate issued by the Federal Aviation Administration, bearing Certificate Number 15EA344, Certificates of Public Convenience and Necessity issued by the United States Department of Transportation pursuant to 49 U.S.C. § 41101 and Canadian Foreign Air Operator Certificate issued by the Minister pursuant to Part VII of the Canadian Aviation Regulations, as well as any other licenses leased, partnered, managed or otherwise related to Debtor. All such licenses and permits must be current and allow for ongoing operations;

c) aircraft charter agreements between the Debtor and (i) Banner

2

Seventeen LLC; (ii) Chicago Blackhawks Hockey Team, Inc.; (iii) Milwaukee Bucks, Inc.; (iv) National Hockey League/Private Jet Services; (v) Boston Professional Hockey Association, Inc.; (vi) the St. Louis Blues Hockey Club, L.P.; and (vii) the owner or operator of the New Jersey Devils professional hockey team, and any other prospective, pending or clients in development at any stage in relation to Debtor; and

d) all trademarks, trade names, logos, e-mail addresses, phone numbers, and other intellectual property of any nature or extent associated with the Debtor's current, planned and/or previous business or operations.

Notwithstanding the foregoing, Beachside shall have the right (in its sole and absolute discretion) to cause any executory contract or unexpired lease to be assumed or rejected on the Plan Effective Date and, to the extent allowed by applicable law, to exclude any particular asset from the scope of the acquired assets, in which case the asset shall not be included in the assets that shall be retained by Reorganized Swift, without any change in the price or terms.

Summary of
Principal
Plan Terms:

The transaction embodied and described herein contemplates the Debtor and Beachside jointly proposing and seeking confirmation of a plan of reorganization for the Debtor in the Debtor's Case. The terms to be memorialized in the Plan and the other definitive documents, including the treatment to be accorded existing secured, administrative, priority, and other claims under the Plan, are summarized below:

1. Nimbos DIP Loan – As of the Effective Date, the Nimbos DIP loan has an aggregate outstanding principal balance of $2.85 million (which includes a $450,000 loan made in April 2013). On the Plan Effective Date or thereafter, at the request of Beachside, Nimbos will assign to Beachside (or its designee), Nimbos's rights under that certain agreement among Nimbos and Avondale Ventures, dated on or about August 15, 2012.

The Nimbos DIP loan obligations shall be assumed by the Reorganized Swift and modified as follows: Payment of the additional $450,000 DIP loan shall begin thirty (30) days after the Plan Effective Date at $70,000 per month principal and interest with the balance of the DIP loan being paid in equal monthly installments of $70,000 beginning at the end of the 9th month after the Plan Effective Date (subject to the adjustments set forth below relating to Supplemental DIP Financing). Interest will accrue at the rate of 3% per annum from Plan Effective Date.

Any DIP financing provided by Nimbos after the Effective Date and before the entry of the Confirmation Order (the "Supplemental Financing") shall be repaid upon the terms and in the manner relating

3

to the repayment of the $450,000 DIP Loan described above, meaning and intending that the monthly payments of $70,000 shall continue to be applied to the Supplemental Financing until such time as the $450,000 DIP loan and the Supplemental Financing have been repaid in full. The monthly payments relating to the remaining DIP loan obligations shall commence after payment of the $450,000 DIP loan and the Supplemental Financing, irrespective of the nine month period described above. Any Supplemental Financing shall be acceptable to Beachside in its sole and absolute discretion.

The maximum amount payable by the Reorganized Swift with respect to any DIP loans by Nimbos, including any Supplemental Financing, shall be $70,000 per month.

Excluding only those claims outlined in the last sentence of this paragraph, to the extent that the aggregate amount of the payments required to be made by the Reorganized Swift for any and all allowed claims payable under the terms of any plan of reorganization, including the allowed claims described in subparagraphs 2(b), 2(c), 3(a), 3(b), 3(c), 4, 5, and 6 below (collectively, the "Plan Payments") exceeds $2,250,000 (the "Payment Cap"), the Reorganized Swift shall be entitled to offset the excess against the monthly payments on the Nimbos DIP loan obligations on a dollar-for-dollar basis as the Plan Payments are made. The term Plan Payments shall exclude only the following: (a) payments made in relation to the Nimbos DIP loan; (b) payments made in relation to any secured claims of the IRS, including any amounts owed under the IRS Payment Agreement (as the same may be amended); and (c) payment of any obligations for ongoing professional fees as described in subparagraph 3(d) hereof.

2. <u>Claims of the IRS, Balkan Air Corporation, and Starflight</u> –

   (a) Swift is presently obligated to the IRS in the aggregate amount of $1,663,347.38, as set forth in that certain IRS Payment Agreement. Kevin Burdette ("Burdette") shall seek to reduce the obligation due the IRS and enter into an amended IRS Payment Agreement to be executed by both Burdette and Swift.

   On the Plan Effective Date, Burdette and Swift shall each be responsible for and timely pay 50% of amounts due and owing under an IRS Payment Agreement (as the same may be amended).

   Burdette shall execute and deliver an agreement or agreements setting forth his liability for 50% of the amounts due and owing under the IRS Payment Agreement (as the same may be modified) and memorializing his agreement to pay 50% of the amounts due and owing as they become due and owing based on the schedule in the existing IRS Payment Agreement.

4

(b) To the extent that the entity referred to by the parties as "Balkan Air Corporation" (or any entity associated or affiliated with Balkan Air Corporation, hereinafter "Balkan Air") is determined to hold an allowed general unsecured claim against the Debtor, such allowed claim will be included in the $360,000 payable to unsecured creditors under section 6 hereof and, in the event the Balkan Air unsecured claim is not included in the $360,000 payable to unsecured creditors, and if the Balkan Air claim is determined to be an allowed secured claim, any and all payments relating to the allowed secured claim will apply toward the Payment Cap. In the event it is determined that Balkan Air holds an allowed secured, administrative or priority claim against the Debtor, any and all payments made by the Reorganized Swift in relation to the allowed claim will apply toward the Payment Cap. In the event Balkan Air initiates a proceeding in the Bankruptcy Court to have some or all of Balkan Air's claim classified as a secured claim, the Reorganized Swift agrees to oppose the proceeding provided good faith grounds for opposition exist and, provided further, that the Reorganized Debtor shall not be required to expend more than $35,000 in contesting the claim.

(c) In the event the entity referred to by the parties as "Starflight" (or any entity associated or affiliated with Starflight, hereinafter "Starflight") initiates a proceeding in the Bankruptcy Court for a determination that Starflight holds an allowed administrative or priority claim of any nature against the Debtor, the Reorganized Swift agrees to oppose the proceeding provided good faith grounds for opposition exist and, provided further, that the Reorganized Debtor shall not be required to expend more than $25,000 in contesting the claim.

3. Administrative Claims:

   a) Ordinary Trade Claims – Except as otherwise provided herein, each allowed administrative claim shall be paid the full amount thereof in cash and without interest, as soon as practicable after the later of (i) as provided in the normal course of business and in accordance with historical trade credit terms as in effect between such creditor and the Debtor, (ii) the Plan Effective Date, (iii) the date on which such administrative claim becomes an allowed administrative claim, and (iv) as such claimant, the Debtor and Beachside may otherwise agree. The Debtor and the DIP Lender estimate that these claims do not exceed approximately $1,100,000 as of the date of this Term Sheet.

   b) Rejection Damage Claims – The allowed claims for rejection of any executory contract or unexpired leases, to the extent entitled to priority under 507(a)(2) (including as a result of 365(g)(2)) shall be paid the full amount thereof in cash and without interest, as soon as practicable after the later of (i) the Plan Effective

5

Date, (ii) the date on which such administrative claim becomes an allowed administrative claim, and (iii) as such claimant and Beachside may otherwise agree.

   c) Professional Fees – Except as set forth in subparagraph 3(d), the allowed claims of all estate professionals, including without limitation, Reimer Braunstein, Morris Andersen, Michael Carmel. Ltd., and Jennings Strauss, for fees and costs due and unpaid as of the Effective Date and to be incurred through the Plan Effective Date, including shall be paid a total of $560,000, on a *pro rata* basis, as follows: $40,000 per month starting on the Plan Effective Date for 14 months. The remaining balance of any allowed professional fee claims shall be waived (except that all professionals may retain payments made to them prior to the date of this Term Sheet). All the professionals must agree, in writing, to this treatment no later than five (5) calendar days after the Effective Date. This is a material condition to the obligation of Beachside to proceed with the transaction described in this Term Sheet. Any increase in the amount payable to the professionals under this subparagraph 3(c) shall require the written consent of Beachside and Nimbos, which consent may be granted, conditioned, or withheld in each of their sole and absolute discretion.

   d) Ongoing Professional Fees – Reimer Braunstein will agree to a fee of up to $100,000 for all additional work from this date forward through the Plan Effective Date.

4. Priority Claims -- Swift Air has represented to Beachside that there are no priority claims filed or scheduled in the case, and that will be no allowed priority claims under the Plan. Each allowed priority claim shall be paid the full amount thereof in cash and without interest, as soon as practicable after the later of (i) as provided in the normal course of business and in accordance with historical credit terms as in effect between such creditor and the Debtor, (ii) the Plan Effective Date, (iii) the date on which such priority claim becomes an allowed administrative claim, and (iv) as such claimant, the Debtor and Beachside may otherwise agree.

5. Critical Vendors -- Each claim of a critical vendor (as shall be identified by the Debtor and the Beachside in the Plan and definitive documents) shall be paid on the Plan Effective Date in full settlement and satisfaction of its allowed claim its *pro rata* share of the sum of $60,000 to be paid over a 24 month period.

6. General Unsecured Claims – Each holder of a general unsecured claim shall receive, in full settlement and satisfaction of its allowed claim, its *pro rata* share of $360,000 to be paid over a 24 month period following the Plan Effective Date. In the event the official committee of unsecured creditors fails to execute this Term Sheet, the $360,000 payment to unsecured creditors provided for by the

6

terms of this paragraph shall not be increased absent further agreement between Beachside and Nimbos. In addition, on the Plan Effective Date, Swift Air shall transfer all of its claims and causes of action arising under chapter 5 of the United States Bankruptcy Code to a liquidating trust for the exclusive benefit of the holders of allowed unsecured claims. The Plan shall provide for the establishment of a liquidating trust and the appointment of a liquidating trustee at the direction of the official committee of unsecured creditors.

7. Equity Interests. – All existing equity interests and warrants and other indicia of ownership of Debtor shall be extinguished on the Plan Effective Date with the holders thereof not receiving any consideration or other remuneration.

Summary of
Additional
Plan/Transaction Terms:

KMW Leasing Administrative Claims – Upon the occurrence of the Plan Effective Date, KMW Leasing will waive and release the Debtor's estate and the Reorganized Swift from any and all claims arising under or related to its lease with the Debtor with regard to the Debtor's use of the aircraft identified as N250MY.

Burdette, Transjet I, LLC and Transjet II, LLC– Upon the occurrence of the Plan Effective Date, Burdette, Transjet I, and Transjet II shall –

a) Acknowledge and agree that amounts owed under the lease for the aircraft identified as N801TJ shall be offset against damages incurred by Swift as a result of Transjet I's and Transjet II's failure to make certain agreed upon payments to Stambaugh Aviation (which are estimated at $600,000 or more through March 2013). To the extent that additional amounts are due under the lease for the N801TJ, Transjet I will waive such additional amounts, and shall release Swift's bankruptcy estate and the Reorganized Swift from all liability for such amounts;

b) Burdette and Swift Aviation will waive any and all claims in respect of past due rents and other obligations arising as a result of the Debtor's occupancy of its existing business premises through the Plan Effective Date;

c) Effective as of the Plan Effective Date, Burdette and Swift Aviation shall enter into a new lease for the Debtor's occupancy of its existing business premises at the fixed rate of $9,000 per month for a term of 6 months;

d) Transjet I and Beachside shall agree upon the terms of a new lease for the aircraft identified as N801TJ upon the following terms or such other terms as acceptable to Beachside in its sole discretion:

 i. Term –12 months (starting from the Plan Effective Date);

7

        ii.    Rent -- $40,000 per month;

        iii.   Expenses – Swift shall be responsible for all ordinary and anticipated expenses of operation, with Transjet 1 being responsible for major engine repairs.

The lease for the N802 is rejected on the Plan Effective Date, with all claims arising out of or related to the Debtor's use or possession of that plane being waived (unless, prior to the Plan Effective Date, the Reorganized Swift and Transjet II reach agreement on the terms of a new lease for the N802).

**Supplemental**
**Post-Confirmation Financing:** Upon entry of the Confirmation Order, and as provided for therein, Beachside and/or its designee (which may or may not be Beachside) shall provide a supplemental DIP financing commitment of up to $600,000 to bridge a portion of the Debtor's working capital needs in the period up to the Plan Effective Date, which supplemental DIP financing shall (a) be on such terms as are acceptable to Nimbos, the Debtor and Beachside (or its designee), which acceptance shall not be unreasonably withheld, (b) be made available upon a schedule (and in such amounts) as shall be included in the Plan and the Confirmation Order, and (c) shall serve as a credit against the cash component of the purchase consideration provided for on Page 1 of this Term Sheet.

**Conditions**
**Precedent:** <u>Regulatory Approvals</u> -- The receipt of all necessary regulatory approvals or consents from governmental units with jurisdiction over the Debtor or the operation of its current business. This applies, without limitation, to the anticipated approval of the United States Department of Transportation (the "DOT") and the Federal Aviation Administration (the "FAA").

<u>Interim Operations</u> -- The continued conduct of the Debtor's business, as currently conducted, between the Effective Date and the closing of the transaction contemplated hereby. If the Debtor ceases operations, or curtails operations in any material way, then this Term Sheet shall terminate and Beachside shall have no liability, whether express, implied, or otherwise, in connection with this Term Sheet or the transaction contemplated hereby.

<u>Chapter 11 Matters</u> -- All agreements from creditors (including holders of administrative expense claims) and all orders shall have been obtained or entered on the docket, as the case may be, in strict accordance with the timeframes established in this Term Sheet. The order confirming the Plan shall establish that, except as expressly provided herein or in the Definitive Documents, all property of the Debtor's estate shall revest in the Reorganized Swift free and clear of all liens, claims, and encumbrances, and the confirmation order shall, in all other respects, be acceptable to Beachside. Time is of the essence.

8

<u>Financial Condition upon entry of the Confirmation Order</u> -- As of the date on which the confirmation order is entered on the docket, Swift Air shall have experienced no material adverse change from the financial condition set forth in the Monthly Operating Report for March 2013 submitted by Swift to the United States Trustee. If the Financial Condition varies in any material way from the March 2013 Monthly Operating Report, then this Term Sheet shall terminate and Beachside shall have no liability, whether express, implied, or otherwise, in connection with this Term Sheet or the transaction contemplated hereby.

<u>Exclusivity:</u>

In consideration of the Beachside's commitment to consummate the transactions contemplated by this Term Sheet, neither the Debtor nor the DIP Lender will, with respect to the Debtor's business or assets or the membership interests in the Debtor, do any of the following:

    a) enter into any agreement or other commitment for the sale or other disposal to any person other than Beachside or its affiliates;

    b) solicit, initiate, or encourage any inquiries or proposals to acquire the Debtor from any person other than Beachside or its affiliates;

    c) initiate or engage in negotiations with any person other than Beachside or its affiliates concerning any proposal to acquire the Debtor; or

    d) discuss, negotiate, or propose any chapter 11 plan for the Debtor (except the one described herein), or the sale of all or substantially all of the Debtor's assets under the applicable sections of the Bankruptcy Code.

This Exclusivity Provision is binding on and enforceable against the DIP Lender on the Effective Date, and binding on Swift Air only upon entry of an order of the Bankruptcy Court specifically approving this aspect of the Term Sheet. If the Bankruptcy Court has not entered an order approving this aspect of the Term Sheet on or before the timeframes provided for herein, then Beachside shall be entitled to terminate this Term Sheet without any liability to any person or entity on such date if, as of such date, the Bankruptcy Court has not entered an order approving the Termination Fee set forth below.

<u>Bankruptcy Court Approval:</u>

The Debtor and the Beachside will submit the Plan for approval to the Bankruptcy Court on an expedited basis, which Plan shall be consistent with the terms set forth in this Term Sheet, and as otherwise may be acceptable to Beachside. The Debtor and Beachside will file and seek conditional approval of a proposed Disclosure Statement to accompany the Plan.

9

| | |
|---|---|
| <u>Current Employees and Management:</u> | Beachside intends to cause the Reorganized Swift to offer employment to all or substantially all of the Debtor's current rank-and-file employees. It is also Beachside's intention to cause the Reorganized Swift to retain current management for continuity, but will retain the right to replace employees as needed. After an evaluation period, Beachside will offer contracts and incentives to the management team at Beachside's sole and absolute discretion. |
| <u>Termination Fee:</u> | Beachside acknowledges that the offer contained herein, and which shall be more formally memorialized in the Definitive Documents, may, under certain circumstances, be subject to the solicitation by Swift Air of higher and/or better offers from third parties. |
| | In consideration of Beachside's agreement to proceed with the Transaction, and as a material inducement for, and condition of, Beachside's entry into the Definitive Documents, Swift Air shall obtain an order of the Bankruptcy Court providing that if (a) any competing plan is confirmed or (b) all or substantially all of Swift Air's assets are sold to a purchaser other than Beachside (by Swift Air or any trustee appointed in a chapter 11 or chapter 7 case), then the Swift Air shall pay to Beachside a termination fee ("Termination Fee") in the aggregate amount of $250,000, which amount shall be paid by Swift Air in immediately available funds on the effective date of the competing plan or the closing of the sale, as applicable. The order approving the Termination Fee shall be acceptable, in all respects, to Beachside, and shall be entered on the docket on or before May 16, 2013. |
| <u>Other Matters:</u> | Beachside's and all other signing party's obligation to consummate the transactions contemplated by this Term Sheet is subject to (a) preparation and timely filing of an acceptable Plan and related Disclosure Statement; (b) timely confirmation of the Plan and the entry of a final and non-appealable Confirmation Order of the Bankruptcy Court confirming the Plan under 11 U.S.C. § 1129; (c) preparation of and execution of all related and ancillary documents, all consistent with the Plan and this Term Sheet and containing terms and provisions satisfactory to Beachside, in its sole and absolute discretion (collectively, "Definitive Documents"); and (d) the satisfaction and occurrence of all conditions to the Plan Effective Date. |

*[Remainder of page intentionally left blank; signatures appear on next pages]*

IN WITNESS WHEREOF the parties have executed this Term Sheet as of the date first above written.

**BEACHSIDE CAPITAL LLC**

By: *[signature]*
    Name: MICHAEL SCHREIBER
    Title: CEO & MANAGING MEMBER

**SWIFT AIR, LLC,**
Debtor and Debtor in Possession

By: _____
    Name:
    Title:

**NIMBOS HOLDINGS, LLC**

By: *[signature]*
    Name: Kenneth M Woolley
    Title: Manager

**TRANSJET I, LLC**

By: _____
    Name:
    Title:

**TRANSJET I, LLC**

By: _____
    Name:
    Title:

**KMW LEASING, LLC**

By: *[signature]*
    Name: Kenneth M Woolley
    Title: Manager

11

IN WITNESS WHEREOF the parties have executed this Term Sheet as of the date first above written.

BEACHSIDE CAPITAL LLC

By: _Michael Schreiber_ (signature)
    Name: MICHAEL SCHREIBER
    Title: CEO & MANAGING MEMBER

SWIFT AIR, LLC,
Debtor and Debtor in Possession

By: _____
    Name:　Hank Torbert
    Title:　Chairman

NIMBOS HOLDINGS, LLC

By: _____
    Name:
    Title:

TRANSJET I, LLC

By: _____
    Name: Kevin Burdette
    Title: VP

~~TRANSJET I, LLC~~　Swift Aviation Services

By: _____
    Name: Kevin Burdette
    Title: VP

KMW LEASING, LLC

By: _____
    Name:
    Title:

11

OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF SWIFT
AIR, LLC

By: _____
     Name:
     Title:

_____
KEVIN BURDETTE

12